**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-1259-WJM

In re:  MERCURY COMPANIES, INC.,

      Debtor.

FNF SECURITY ACQUISITION, INC.,
FIDELITY NATIONAL TITLE COMPANY, f/k/a SECURITY TITLE GUARANTY CO.,
USA DIGITAL SOLUTIONS, INC.,
AMERICAN HERITAGE TITLE AGENCY, INC.,
MERCURY SETTLEMENT SERVICES OF UTAH, INC., and
UNITED TITLE COMPANY, INC.,

      Appellants,

v.

MERCURY COMPANIES, INC.,

      Appellee.

---

**ORDER VACATING BANKRUPTCY COURT'S JUDGMENT AND
REMANDING FOR FURTHER PROCEEDINGS**

---

FNF Security Acquisition, Inc., Fidelity National Title Company, USA Digital

Solutions, Inc., American Heritage Title Agency, Inc., Mercury Settlement Services of

Utah, Inc., and United Title Company, Inc. (collectively, "Defendants" or "Fidelity" unless

otherwise specified) appeal the bankruptcy court's judgment against them.  (ECF

No. 2.)  The bankruptcy court ruled that FNF Security Acquisition breached a stock

purchase agreement when it refused to make a final installment payment under that

agreement.  The bankruptcy court also ruled that Defendants must return funds they

received through what the court determined was a constructive fraudulent transfer.

Mercury Companies, Inc. ("Mercury") cross-appeals the bankruptcy court's ruling that the stock purchase transaction mentioned above was not subject to avoidance. (ECF No. 6.) For the reasons set forth below, the Court vacates the bankruptcy court's judgment and remands for further proceedings consistent with this opinion.

## I. LEGAL STANDARD

In reviewing a bankruptcy court's decision, the district court normally functions as an appellate court, reviewing the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. 28 U.S.C. § 158(a); *In re Warren*, 512 F.3d 1241, 1248 (10th Cir. 2008). Fidelity, however, argues that the bankruptcy court lacked jurisdiction to enter judgment in light of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), *Langenkamp v. Culp*, 498 U.S. 42 (1990), and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). (ECF No. 23 at 17–20.) Thus, says Fidelity, the Court must treat the bankruptcy court's ruling and judgment as findings and recommendations only, subject to complete *de novo* review. (*Id*.)

The Court previously rejected this jurisdictional argument from these very Defendants. *See generally Mercury Cos., Inc. v. FNF Sec. Acquisition, Inc.*, 460 B.R. 778 (D. Colo. 2011). This Court held that *Stern*, *Langenkamp*, and *Granfinanciera* changed nothing with respect to parties that consent to the bankruptcy court's plenary jurisdiction, and that Defendants had so consented. *See id*. at 780–84. Nothing has changed in the interim. The Court recognizes that the United States Courts of Appeals for the Fifth and Sixth Circuits have since ruled that consent might not be enough. *See In re BP RE, L.P.*, 735 F.3d 279, 286–88 (5th Cir. 2013); *Waldman v. Stone*, 698 F.3d

2

910, 919 (6th Cir. 2012).  Those cases do not control in this circuit and the Court finds them unpersuasive.

The Court will therefore apply the traditional appellate standard, reviewing legal questions *de novo* and fact questions for clear error.  *Warren*, 512 F.3d at 1248.  On mixed questions of law and fact, the Court reviews *de novo* any question that primarily involves the consideration of legal principles, and applies the clearly erroneous standard if the mixed question is primarily a factual inquiry.  *In re Wes Dor, Inc.*, 996 F.2d 237, 241 (10th Cir. 1993).

## II.  FACTUAL AND PROCEDURAL HISTORY

The following facts suffice for a general overview of this matter.  The Court will discuss additional facts as they become relevant to the legal issues presented below.

### A.     The Comerica Sweep

Mercury and its subsidiaries were in the settlement services industry, including title and escrow services, mortgage document preparation, and similar services related to real estate transactions.  (Stipulated Facts ¶ 3.)[1]  In April 2008, Mercury obtained a $45 million loan from Comerica Bank ("Comerica") secured by most of Mercury's and its subsidiaries' assets.  (Bankruptcy Court's Mar. 31, 2014 Order ("Order") (ECF No. 23-1) at 2.)

On July 25, 2008, Comerica called a default and swept about $40 million from Mercury's operating accounts.  (*Id.*)  The record does not say why Comerica called this

---

[1] "Stipulated Facts" refers to the stipulations contained in Part II of the parties' joint pretrial order in the bankruptcy court, docketed in this matter at ECF No. 15-5, beginning at page 350 (R., Vol. 5, part 2, at 705).

default, but all of this came in the midst of the real estate decline that formed a major part of the recent recession.  The parties' briefs imply that this bleak economic situation at least partly prompted Comerica's actions.  In any event, Mercury soon began shutting down offices and subsidiaries outside of Colorado.  (*Id*.)

## B.    The Stock Purchase Agreement (SPA)

Although Mercury's Colorado subsidiaries remained open and operating to some extent, Mercury CEO Jerrold Hauptman ("Hauptman") nonetheless decided to sell them, and quickly.  (*Id*. at 2–3, 16–18.)  Hauptman called First American Title ("First American") on July 31, 2008, with an offer to sell all subsidiaries for $1 million.  (*Id*. at 3; Stipulated Facts ¶ 10.)  First American declined.  (Order at 3.)  Hauptman then turned to Fidelity with an offer of $5 million.  (*Id*.)  Fidelity wanted time for due diligence but Hauptman refused, stating that there was no time for "haggling."  (*Id*. at 17.)

On August 5, 2008, Fidelity's and Mercury's representatives met and, within the course of that day, collectively drafted a Stock Purchase Agreement ("SPA") (ECF No. 23-2).  (*See* Order at 3; Stipulated Facts ¶ 15.)  The SPA transferred ownership of Mercury's Colorado subsidiaries to Defendant FNF Security Acquisition, Inc. ("FNF"), for $5 million "in immediately available funds."  (SPA § 1.)  The SPA directed Fidelity to pay this sum in two installments: $1 million "upon execution of [the SPA]," and "the balance . . . as set forth in Section 3."  (*Id*.)

Section 3 set up a post-execution procedure for Mercury to disclose additional information relevant to the sale.  Specifically, Section 3 gave Mercury two weeks to deliver several "Schedules" to Fidelity.  (SPA § 3.)  Among them was "a schedule of all

liabilities of the Purchased Companies in excess of $50,000." (*Id*. § 3.4.)  When Fidelity received that and the other Schedules, it and Mercury had two weeks to "work together in good faith to revise the Schedules to the extent appropriate based on [Fidelity's] review." (*Id*. § 3.8.)[2]  Finally, "[u]pon [Fidelity's] indication of satisfaction with the Schedules, which indication will not be unreasonably withheld, and the accuracy of [Mercury's] representations and warranties contained herein, [Fidelity] will pay the balance of the Purchase Price to [Mercury]." (*Id*.)

The "representations and warranties contained herein" included Mercury's representation that certain financial statements attached to the SPA "fairly present the financial condition and results of operations of the Purchased Companies as of the date thereof." (*Id*. § 4.8.)  The "date thereof " (*i.e.*, of the attached financial statements) was June 30, 2008. (*Id*., Schedule 4.8.)[3]

## C.    Payment and Non-Payment of the Purchase Price

The parties executed the SPA effective August 5, 2008—the same day it was negotiated. (Order at 3.)  Fidelity wired $1 million directly to Mercury that same day. (*Id*.)  The next day, Fidelity wired almost $1.5 million to Comerica, thus paying off Mercury's outstanding obligations there. (*Id*.)  The parties treated this $1.5 million to Comerica as part of the purchase price, meaning that Fidelity had to this point paid about $2.5 million of the agreed-upon $5 million. (*Id*.)

---

[2] The bankruptcy court cited this portion of the SPA as § 3.8. (*See, e.g.*, Order at 21.)  It is actually a flush paragraph following § 3.8 and continuing the main text begun at the top of § 3.  For consistency, however, the Court will refer to the flush paragraph as § 3.8.

[3] Schedule 4.8 and SPA § 4.8 are distinct.  Schedule 4.8 is an attachment to the SPA. SPA § 4.8 warrants the accuracy of Schedule 4.8.

Sometime in the next two weeks, Fidelity learned that the purchased subsidiaries carried about $8.6 million in liabilities not previously disclosed.  (ECF No. 23 at 15.) Fidelity claims that about $5.1 million of these liabilities existed as of June 30, 2008 (the date of the financial statement represented to be accurate "as of the date thereof"). (ECF No. 27 at 10–17.)  Supposedly because of this disappointing information, Fidelity refused to pay the remaining $2.5 million.  (ECF No. 23 at 15.)

**D.     The $1.6 Million Transfer from Mercury to the Subsidiaries**

Between execution of the SPA and Fidelity's refusal to pay the remaining $2.5 million, Mercury employees concluded that about $1.6 million in Mercury's bank account actually belonged to five of the subsidiaries that it had just sold to Fidelity. (Stipulated Facts ¶¶ 53, 55.)  Thus, on August 8, 2008, Mercury transferred that money to the affected subsidiaries.  (*Id*. ¶ 55.)

**E.     Bankruptcy Proceedings**

Mercury filed for Chapter 11 protection in late August 2008.  (*Id*. ¶ 25.) Eventually, it filed an adversary proceeding against Fidelity (specifically, against FNF) to recover the value of the Colorado subsidiaries, alleging that the sale to Fidelity had been a constructive fraudulent transfer.  (Record ("R."), Vol. 1, part 1 (ECF No. 15-1) at 61–69.)  Mercury also alleged breach of contract in light of Fidelity's refusal to pay the remaining $2.5 million of the purchase price.  (*Id*.)  Finally, Mercury asserted an avoidance claim against the five Colorado subsidiaries that received the $1.6 million transferred on August 8, 2008 (*i.e.*, the five Defendants here other than FNF).  (*Id*.) Mercury claimed that the $1.6 million had not, in fact, belonged to those subsidiaries,

6

and therefore was a constructive fraudulent transfer, or alternatively, a preference. (*Id.*)

After a three-week trial, the bankruptcy court issued its Order holding: (a) the $5 million sale of the Colorado subsidiaries was not a constructive fraudulent transfer; (b) Fidelity breached the SPA, and its implied covenant of good faith and fair dealing, by refusing the pay the $2.5 million balance of the purchase price; and (c) the $1.6 million was a constructive fraudulent transfer. The bankruptcy court entered judgment against FNF for $2.5 million, plus prejudgment interest running from August 5, 2008 (the date of the SPA); and against the Colorado subsidiaries for $1.6 million, plus prejudgment interest also running from August 5, 2008.[4]

## III. ANALYSIS

Fidelity has appealed the $2.5 million and $1.6 million judgments, as well as certain issues regarding standing and prejudgment interest. (ECF No. 2.) Mercury has cross-appealed the bankruptcy court's conclusion that the SPA was not a constructive fraudulent transfer. (ECF No. 6.) These issues are somewhat intertwined because the SPA's proper interpretation may affect the sale price, which in turn may affect whether the sale was a constructive fraudulent transfer. The Court will therefore address the breach-of-contract question first, followed by the fraudulent transfer analysis.

### A. Breach of the SPA

With respect to the SPA, the question at issue is whether Fidelity breached it (or its implied covenant of good faith and fair dealing) by refusing to pay the remaining $2.5 million in light of the additional liabilities Fidelity discovered in the post-execution

_____

[4] Interest on the $1.6 million comes by way of an order amending the judgment. (*See* R., Vol. 4, part 2 (ECF No. 15-8) at 2426–30.)

exchange of information.  The bankruptcy court held that the SPA unconditionally required payment of the remaining $2.5 million.  Specifically, it concluded that SPA § 3.8 required Fidelity "to work with Mercury to make sure [the] information [disclosed in the Schedules] was acceptable.  No provision stated that [Fidelity] could withhold the balance of the purchase price if it found the information lacking or inaccurate."  (Order at 21; *see also id*. at 22 ("The SPA provided [Fidelity] with ample time to request more information and to work with Mercury in obtaining more information, but [it] does not state [that] any negative information forgives payment of the rest of the sales price.").)

Delaware law governs the SPA.  (SPA § 12.)  In Delaware as in this jurisdiction, questions of contract interpretation receive *de novo* review.  *In re Whatley*, 169 B.R. 698, 702 (D. Colo. 1994); *aff'd*, 54 F.3d 788 (10th Cir. 1995); *Oberly v. Kirby*, 592 A.2d 445, 457 (Del. 1991).  Upon *de novo* review, the Court finds the bankruptcy court's reading incorrect as a matter of law.

The SPA states that Fidelity and Mercury must "work together in good faith to revise the Schedules to the extent appropriate based on [Fidelity's] review."  (SPA § 3.8.)  This language cannot support the bankruptcy court's conclusion that Fidelity must "work with Mercury to make sure [the] information [disclosed in the Schedules] was acceptable."  Order at 21.  Such an interpretation suggests that Fidelity had a duty to make sure the Schedules conformed to a foregone conclusion—*i.e.*, that the Schedules would support the purchase no matter what information they originally contained.  The Court cannot see how Fidelity could perform such a duty.  Surely neither Fidelity nor Mercury could fabricate numbers to make sure the information "was acceptable."

The bankruptcy court's interpretation also ignores the SPA's payment structure generally.  Section 1 requires an up-front payment and allows Section 3 to govern the balance.  Section 3 requires Mercury to disclose additional information and then specifies Fidelity's duty to pay the balance: "Upon [Fidelity's] indication of satisfaction with the Schedules, which indication will not be unreasonably withheld, and the accuracy of [Mercury's] representations and warranties contained herein, [Fidelity] will pay the balance of the Purchase Price to [Mercury]."  (SPA § 3.8.)

This condition is not well drafted.  The clause beginning with "the accuracy of" could conceivably connect to "[u]pon" or to "indication of" or to "satisfaction with."  Only "satisfaction with," makes any real sense, however, and the parties do not argue otherwise.  Thus, Fidelity's duty to pay the balance arose "[u]pon [its] indication of satisfaction with [1] the Schedules . . . and [2] the accuracy of [Mercury's] representations and warranties contained [in the SPA]."

The phrase "which indication will not be unreasonably withheld" explicitly constrains the first "indication of satisfaction."  To the extent this constraint does not carry over to the second "indication," the implied covenant of good faith and fair dealing has the same effect: "the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).  In either case, the SPA contemplates at least one scenario in which Fidelity can refuse to pay the balance, *i.e.*,

when it would be *reasonable* to withhold its "indication of satisfaction."[5]

The bankruptcy court was therefore mistaken to interpret the SPA as requiring Fidelity to indicate its satisfaction regardless of the information it received from Mercury under Section 3.  Indeed, there would be no point in holding back the balance of the purchase price subject to review of later-disclosed information if there was no scenario in which that later-disclosed information might excuse payment of the balance.[6]

The proper inquiry, then, is whether Fidelity reasonably refused to indicate its satisfaction with that information.  "[C]ontractual reasonableness is a fact question[.]" *Union Oil Co. of Cal. v. Mobil Pipeline Co.*, No. CIV.A. 19395-N, 2006 WL 3770834, at *11 (Del. Ch. Dec. 15, 2006).  Because the bankruptcy court believed there was no circumstance in which Fidelity could withhold the remaining $2.5 million, the bankruptcy court did not reach this question, nor have the parties argued it to this Court.  The Court will therefore vacate the bankruptcy court's breach-of-contract and good faith/fair dealing findings, and remand for additional findings in light of the foregoing analysis. The Court provides the following additional guidance regarding that process:

---

[5] One might normally expect that the whole transaction should be undone— Fidelity should return the purchased subsidiaries and Mercury should return the amounts already paid—if Fidelity reasonably refuses to hand over the balance of the purchase price.  But the SPA does not say this, nor does any party argue that the parties intended to unwind the SPA if Fidelity never paid the remaining $2.5 million.  This means that the guaranteed contract price is only $2.5 million, not $5 million, which may be relevant to the "reasonably equivalent value" analysis, as discussed in Section IV.B, below.

[6] Neither the SPA nor any of the surrounding circumstances suggest that delayed payment of the remaining $2.5 million was for economic convenience—that Fidelity needed time to raise the funds, for example, or wanted to avoid booking a particular charge until some other event had passed.  Rather, the SPA specified that the entire $5 million was "immediately available."  (SPA § 1.)

First, the definition of "fairly presents" from SPA § 4.8 remains open for the parties to argue to the bankruptcy court.

Second, regardless of the definition of "fairly presents," that standard as applied to SPA Schedule 4.8 must be judged as of June 30, 2008—"the date thereof." (*See* SPA § 4.8.)

Third, contrary to Fidelity's position in its appeal briefs, Fidelity's ability to refuse to pay the additional $2.5 million does not turn entirely on whether Schedule 4.8 "fairly present[ed]" Mercury's finances.  The ultimate question under SPA § 3.8 is whether Fidelity acted reasonably or unreasonably under the circumstances when it withheld its "indication of satisfaction with . . . the accuracy of" Mercury's representation in SPA § 4.8 that Schedule 4.8 fairly presented the relevant financial information.

Fourth, Fidelity's stipulations in SPA §§ 5.1 to 5.3 do not resolve the reasonableness question.  Through these stipulations, Fidelity agreed that it "had the opportunity to ask questions of and receive answers" from Mercury, that Fidelity "received satisfactory answers," and that Fidelity was a generally sophisticated party in this area of commerce.  However, the SPA's structure makes clear that the parties intended to close quickly but hold back a portion of the purchase price subject to further review of information that Mercury was not willing to gather and present before execution.  SPA §§ 5.1 to 5.3 must be considered in that light.  To be sure, Fidelity's pre-execution knowledge or suspicion (if any) about Mercury's liabilities should inform the reasonableness inquiry, but SPA §§ 5.1 to 5.3 do not establish that Fidelity could have and should have known about or suspected Mercury's additional liabilities.

11

Fifth, the current trial record may be enough to decide the reasonableness question. This Court leaves it to the bankruptcy court's discretion whether to rely on that record or to receive additional evidence.

**B.      "Reasonably Equivalent Value" for the Purchased Companies**

The Bankruptcy Code allows Mercury to "avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor * * * received less than a reasonably equivalent value in exchange for such transfer or obligation; [] and was insolvent on the date that such transfer was made . . . ." 11 U.S.C. § 548(a)(1)(B)(i) & (ii)(I). The parties agree that Mercury was insolvent when it sold its Colorado subsidiaries to Fidelity. (Stipulated Facts ¶ 24.) The parties dispute whether Mercury received reasonably equivalent value for those subsidiaries.

Courts have noted that reasonably equivalent value "is not susceptible to simple formulation." *In re Commercial Fin. Servs., Inc.*, 350 B.R. 559, 578 (Bankr. N.D. Okla. 2005) (internal quotation marks omitted). A common test, however, is to consider "the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (internal quotation marks omitted). Reasonable equivalence is viewed "objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspectives of the debtor or transferee." *Commercial Fin. Servs.*, 350 B.R. at 578 (internal quotation marks omitted).

12

The focus of the parties' dispute is whether Mercury's rushed decision to sell quickly for $5 million can satisfy the foregoing standard.  The bankruptcy court reasoned that it could.  Although this Court agrees with the bankruptcy court's analysis of the second and third factors (arm's-length and good faith), the bankruptcy court's approach to the first factor (value of the benefit received) and to the overall analysis requires vacating and remanding.

Concerning the arm's-length analysis, Mercury does not challenge the bankruptcy court's findings.  The Court therefore need not address this further.  As for good faith, Mercury offers two arguments.  The first is that the bankruptcy court erred in finding that Fidelity acted in good faith, given that Fidelity knew of Mercury's financial distress and insolvency at the time the SPA was negotiated.  (ECF No. 26 at 48–49.) Mercury cites decisions where courts held that knowledge of a roughly similar character negated good faith.  (*See id*. (citing *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995) (affirming bankruptcy court's finding of no good faith where transferees knew specifics of transferor's medical debts, of transferor's specific other debts, of an impending lawsuit against the transferor, of the transferor's inability to make mortgage payments, and of a bank's intent to foreclose); and *In re Vaso Active Pharm., Inc.*, No. 10-10855 CSS, 2012 WL 4793241, at *20 (Bankr. D. Del. Oct. 9, 2012) (lack of good faith where buyer knew of transferor's inability to pay all creditors and that the transferred asset was transferor's "only substantial asset")).)

However, even these cases acknowledge that good faith has no precise definition and is judged on a case-by-case basis.  *Sherman*, 67 F.3d at 1355; *Vaso*, 2012 WL 4793241, at *2.  On appeal, moreover, good faith findings are reviewed "for

clear error." *Sherman*, 67 F.3d at 1355.  The Court sees no clear error here.  Fidelity had general knowledge of Mercury's financial situation but the bankruptcy court was justified in finding, under the circumstances of this case, that Fidelity's nonetheless acted in good faith.  This Court therefore rejects Mercury's first challenge to the bankruptcy court's good faith analysis.

Mercury's second challenge is that the bankruptcy court gave the good faith factor far too much weight, to the detriment of supposedly more important factors such as fair market value.  But the reasonably equivalent value test is, in the end, a "totality of the circumstances" test.  *Fruehauf*, 444 F.3d at 213.  Such a test necessarily involves weighing by, and significant discretion vested in, the finder of fact.  The Court accordingly declines to rule that the good faith factor necessarily received too much weight in the overall analysis.

Mercury's argument nonetheless shades into another of its arguments, *i.e.*, that the bankruptcy court inadequately considered the first factor in the totality-of-the-circumstances analysis: "fair market value of the benefit received as a result of the transfer."  *Id*.  The Court agrees.

Although reasonably equivalent value looks at the totality of the circumstances, a thorough inquiry into fair market value is usually an indispensable part of the analysis. Fidelity is correct that "reasonably equivalent value" does not necessarily equate to "fair market value," and that "fair market value" actually makes no sense as part of the "reasonably equivalent value" analysis *if* the sale happens through the foreclosure process.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).  But outside

14

the foreclosure context, "the 'reasonably equivalent value' criterion will continue to have . . . a meaning similar to fair market value."  *Id*.; *see also In re Kemmer*, 265 B.R. 224, 232 (Bankr. E.D. Cal. 2001) ("The concept of 'reasonable equivalence' is not wholly synonymous with 'market value' even though market value is an extremely important factor to be used in the court's analysis.").

Mercury's sale to Fidelity was not a foreclosure, nor was it some sort of distressed sale that might be treated similarly.  Obviously the sale was rushed, but the bankruptcy court made numerous findings that the rush resulted entirely from Mercury's officers' subjective beliefs about the need for a quick sale, and those officers may have been willfully ignorant of Mercury's actual situation:

• ". . . Mercury's officers held an incorrect belied [that] the [Comerica] sweep [of $40 million from Mercury's bank accounts] required immediate sale of the Colorado Subsidiaries."  (Order at 16.)

• ". . . the belief [that] Mercury lacked the cash to cover the August 6, 2008 payroll was wrong."  (*Id*.)

• ". . . Mercury mistakenly believed the Colorado Department of Insurance would [soon] close Mercury . . . ."  (*Id*.)

• ". . . Mercury's [officers] . . . acted on mistaken beliefs rather than engaging in due diligence to obtain accurate information."  (*Id*. at 17.)

• ". . . Mercury did not verify what funds [it] had available after the Comerica sweep . . . ."  (*Id*.)

• "[Mercury CEO] Hauptman . . . knew of [sufficient] cash [to make payroll]."  (*Id*.)

- ". . . the evidence reveals [that] Mercury, and in particular Hauptman, simply panicked."  (*Id.*)

- "What is apparent from the evidence is that Hauptman desired an immediate sale."  (*Id.*)

- ". . . the information Hauptman [knew at the time he negotiated the SPA] . . . indicates the panic was unnecessary . . . ."  (*Id.*)

- "Mercury chose to proceed ignoring certain information or knowing it had inadequate information, and chose to offer [Fidelity] the stock in the Colorado Subsidiaries for $5 million to obtain an immediate sale."  (*Id.* at 17–18.)

- "Mercury had the ability to ask for more time.  Mercury had cash to use to pay payroll and knew at or near the time of the sale [that] the cash was in accounts not affected by the bank sweep.  Mercury had the ability to conduct additional research into what the Colorado Subsidiaries actually owned.  It did none of these things."  (*Id.* at 18.)

The Court perceives no error in any of these findings, much less clear error, nor does any party challenge them.  In spite of them, however, the bankruptcy court concluded that "[t]hese facts are indicative of the 'willing buyer and willing seller, negotiating at arms length with no coercion' and support a finding of fair market value." (*Id.*)

The legal effect of undisputed facts is a matter this Court reviews *de novo*.  *See, e.g.*, *In re Kasparek*, 463 B.R. 142 (B.A.P. 10th Cir. 2011).  As a matter of law, the Court cannot agree with the bankruptcy court's application of these facts to governing

law.  Again, the ultimate question is whether the seller obtained reasonably equivalent value from the objective creditor's perspective, "without regard to the subjective needs or perspectives of the debtor or transferee."  *Commercial Fin. Servs.*, 350 B.R. at 578 (internal quotation marks omitted); *see also In re WRT Energy Corp.*, 282 B.R. 343, 407 (Bankr. W.D. La. 2001) ("[T]he fair market value of what the debtor gave and received must be valued objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspectives of the debtor or transferee.").  Thus, various courts have held that debtors who sell for a price intended to satisfy their own subjective needs generally do not sell for a reasonably equivalent value.  *See, e.g.*, *Sherman*, 67 F.3d at 1356 (". . . the transfer of the twelve properties did not bear the earmarks of an arms-length transaction.  The purchase price of the properties directly corresponded to the amount of indebtedness on the properties, not their fair market values."); *In re Seitz*, 400 B.R. 707, 719 (Bankr. E.D. Mo. 2008) ("Austin admitted that he approached Thomas, hat-in-hand, advising Thomas of his need for $260,000.00 and inquiring as to whether Thomas would be interested in purchasing the Remaining Interest.  Austin's openness about his financial straits (a tactic which generally defies both business and common sense) in approaching Thomas—a sophisticated businessman—made Thomas's offer more equivalent to a fire-sale price than a price reflecting reasonably equivalent value."); *Kemmer*, 265 B.R. at 232 ("The Kemmers were not trying to sell the Property for its 'reasonable' value, and they had no incentive to negotiate with the Mundays for a higher and better price.  Their intent was to 'fire-sale' the Property within forty days."); *In re Nance*, 26 B.R. 105, 107 (Bankr. S.D.

Ohio 1982) ("The bald facts are that defendants Fraley paid debtors $3,500.00 for the property, that price being set, not because of the value of the property, but because that was the amount that Nance needed to pay some tax obligations.").

The bankruptcy court therefore erred in considering Mercury's subjective, mistaken, and perhaps willfully ignorant "panic" as sufficient to satisfy either the fair market value analysis specifically or the totality of the circumstances test generally. The bankruptcy's court's reasonably equivalent value conclusion must be vacated and remanded for further findings about the fair market value of the subsidiaries Mercury sold to Fidelity.  The Court provides the following additional guidance regarding that process:

First, from this Court's current perspective, it appears that the reasonably equivalent value question cannot be answered without first resolving whether Fidelity reasonably withheld the $2.5 million balance of the purchase price, as discussed in Section III.A, above.  If Fidelity reasonably withheld, then reasonably equivalent value must be judged according the approximately $2.5 million Mercury received.  If Fidelity unreasonably withheld, then reasonably equivalent value must be judged according the entire $5 million that Mercury should have received.

Second, the Court notes that the parties' valuation experts had different assumptions about how far into the future a sale could haven take place, with Mercury's expert assuming that the sale could have waited 30–60 days and Fidelity's expert assuming that the sale needed to take place immediately.  (*See* Order at 6.)  The Court expresses no opinion on this difference and leaves it to the bankruptcy court to weigh the credibility and effect of these assumptions on the value of the subsidiaries.

Third, the current record may be sufficient to resolve the reasonable equivalence question. The bankruptcy court has already shown extensive familiarity with the parties' experts' opinions. (*See* Order at 6–10.) Nonetheless, it is within the bankruptcy court's discretion whether to resolve reasonable equivalence on the current record or to receive additional evidence.

**C.     The $1.6 Million Transfer from Mercury to the Subsidiaries**

As discussed above, after executing the SPA, Mercury transferred about $1.6 million to the subsidiaries that Fidelity now owned. In the bankruptcy court, Mercury claimed that this transfer was a mistake and should be avoided. The bankruptcy court agreed. Fidelity offers various challenges to this result, all of which may be moot if the bankruptcy court concludes on remand that the entire sale of the subsidiaries must be avoided for lack of reasonably equivalent value. To the extent the bankruptcy court finds otherwise, however, the Court rules as follows on Fidelity's challenges regarding the $1.6 million.

1.     <u>Standing</u>

Fidelity claims Mercury lacks standing to pursue the $1.6 million against the subsidiaries given the language of Mercury's reorganization plan. The Court rejects this argument.

When Mercury filed for bankruptcy, its causes of action became a part of its bankruptcy estate. *See In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1057 (10th Cir. 1995) ("Property of the bankruptcy estate includes causes of action belonging to the debtor at the time the case is commenced."). However, a confirmed Chapter 11 reorganization plan may appoint a representative to enforce causes of action belonging to the estate.

19

11 U.S.C. § 1123(b)(3)(A)–(B).

In the middle of Mercury's adversary proceeding, the bankruptcy court confirmed Mercury's Chapter 11 reorganization plan.  This plan re-vested in Mercury the power "[t]o investigate and prosecute or abandon all Causes of Action belonging to or assertible [*sic*] by the Estate, including all Avoidance Claims."  (ECF No. 23-8 § 8.02(d)(ii).)

Fidelity nonetheless argues that Mercury had no standing to pursue the $1.6 million from the subsidiaries because the reorganization plan later mentions the ongoing adversary proceeding specifically but only with reference to FNF, not the other Defendants:

> [T]he powers and duties of [Mercury] shall include * * * [the power] [t]o prosecute and/or settle the Adversary Proceeding brought by [Mercury] against FNF Security Acquisition, Inc. (Adv. Proc. No. 10-01133 MER), including the authority to return the purchase price received in respect of the relevant entities if and to the extent FNF Security Acquisition, Inc. is determined to have been a good faith transferee of a fraudulent transfer[.]

(*Id*. § 8.02(d)(xiv).)  Fidelity claims that this creates some sort of ambiguity about the scope of Mercury's powers following confirmation of its reorganization plan.  (ECF No. 23 at 31–38.)

The Court sees no ambiguity in this case.  Mercury was already litigating against the subsidiaries when its Chapter 11 plan was confirmed.  That litigation continued without interruption after confirmation.  Thus, to the extent notice or specificity was needed, the ongoing adversary proceedings already provided it.  The Court agrees with the bankruptcy court that Mercury had standing to pursue the $1.6 million from the

subsidiaries.

2.    Whether the Transfer Was a Preference Under 11 U.S.C. § 547

Before the bankruptcy court, Mercury argued alternatively that the $1.6 million was either a constructive fraudulent transfer or a preference.  The bankruptcy court concluded that the transfer was not a preference, but it was constructively fraudulent. (Order at 25–28.)  Fidelity argues that the transfer *was* a preference,[7] but does not otherwise challenge the bankruptcy court's conclusion that the transfer was constructively fraudulent.  (ECF No. 23 at 38–42.)  The Court will therefore address only the bankruptcy court's no-preference conclusion.

A preference is a transfer of the debtor's property to a creditor, usually made within ninety days before filing a bankruptcy petition, that allows the creditor to receive a greater payoff than the creditor would have received through the bankruptcy process. *See* 11 U.S.C. § 547(b).  The question here is whether the subsidiaries receiving the $1.6 million were Mercury's creditors.  If not, then by definition a preference would be impossible.

Answering this question requires further background regarding Mercury's financial structure.  On a daily basis, Mercury swept all of its subsidiaries' bank accounts and deposited that money into Mercury's own "Concentration Account." Mercury would also transfer money into the subsidiaries' accounts on a daily basis to cover each subsidiary's specific needs.  Thus, from day to day, Mercury could owe

---

[7] Fidelity says that if the transfer was a preference only, Fidelity would be required to return the money but could make a claim on the bankruptcy estate for that amount.  (ECF No. 23 at 38.)  By contrast, whether Fidelity can return a fraudulently transferred asset and still make a claim on the estate is an open question.  (*See id*.)

money to a subsidiary or a subsidiary could owe money to Mercury depending on how much was taken from or deposited in the subsidiary's account.  (*See* Order at 23–24.) When Mercury transferred $1.6 million to its former subsidiaries, it believed it was transferring money generated by those subsidiaries that had been swept into the Concentration Account, creating a debt running in the subsidiaries' favor.  (Stipulated Facts ¶ 53.)  In other words, Mercury believed it was paying off a creditor.

For two reasons, the bankruptcy court concluded that the subsidiaries were not Mercury's creditors.  First, the bankruptcy court relied on the parties' pretrial stipulation that the subsidiaries "are not creditors of Mercury."  (Stipulated Facts ¶ 67.)  Fidelity argues that this means only what it says, *i.e.*, that the subsidiaries were not Mercury's creditors at the time the stipulation was made (just before trial), given that the subsidiaries had already received the $1.6 million.  Mercury does not challenge this interpretation of the stipulation, and this Court agrees with it.  Accordingly, the stipulation did not establish that the subsidiaries were not creditors *before* receiving the $1.6 million.

Second, the bankruptcy court invoked the following clause from the SPA, which cancels all intercompany debts between Mercury and the subsidiaries: "Effective as of the Closing Date, all intercompany accounts representing receivables and payables between the [subsidiaries] . . . on the one hand, and [Mercury] . . .  on the other hand, shall be eliminated and released without payment of any amount."  (SPA § 9.)  Fidelity's only challenge to this clause is that the subsidiaries are not signatories to the SPA and therefore not bound by it.  *See, e.g.*, *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 760 (Del. Ch. 2009) ("the ordinary rule is that only the

22

formal parties to a contract are bound by its terms"). Fidelity's argument is beside the

point. Mercury and Fidelity (FNF, to be precise) are bound by the SPA, and from these

parties' perspectives, there was no debtor-creditor relationship between Mercury and

the subsidiaries. In other words, Mercury could not (without breaching the SPA) treat

the subsidiaries as creditors, and Fidelity could not (without breaching the SPA) allow

its wholly owned subsidiaries to behave as Mercury's creditors. The bankruptcy court

was therefore correct to conclude that the subsidiaries were not Mercury's creditors,

and therefore the $1.6 million transfer was not a preference.

> 3.   Prejudgment Interest

The bankruptcy court awarded prejudgment interest on the $1.6 million, running

from August 5, 2008, the date of the SPA, rather than August 8, 2008, the date of the

transfer. The Court presumes this was a clerical error. Regardless, there is no

justification for awarding interest on disputed money while it is still in the bank account

of the party claiming interest. To the extent the bankruptcy court on remand once again

enters judgment against Fidelity for the $1.6 million, any prejudgment interest the

bankruptcy court chooses to award should run from no earlier than August 8, 2008.[8]

Fidelity nonetheless claims that prejudgment interest can only run from the date

---

[8] From the Court's current vantage point, there appears to be no scenario in which the bankruptcy court on remand would not again award the $1.6 million to Mercury: if the sale of the subsidiaries must be avoided, then the $1.6 million should never have left the Mercury family of companies in the first place; and if the sale of the subsidiaries was appropriate, Fidelity has abandoned any challenge to the bankruptcy court's finding that the $1.6 million was a constructive fraudulent transfer. However, this Court is not as familiar with the proceedings and nuances of this case as the parties and the bankruptcy court. Accordingly, the Court leaves it to the bankruptcy court to determine on remand whether Fidelity is still liable for the $1.6 million.

of the demand, or, absent a demand, from the date the complaint was filed.  (ECF No. 23 at 42–43 (citing cases).)  None of the cases Fidelity cites establishes that proposition as the exclusive rule, and other authorities permit an award of prejudgment interest from the date of the fraudulent transfer.  *See Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) ("Once the district court has identified the avoidable transfers, it has the discretion to permit the receiver to recover pre-judgment interest on the fraudulent transfers from the date each transfer was made."); *see also Wing v. Gillis*, 525 F. App'x 795, 802 (10th Cir. 2013) ("The court could have . . . awarded prejudgment interest from . . . when a transfer was made . . . .").  This Court defers to the bankruptcy court's discretion on such a matter, and sees no abuse of it in this instance.  The Court therefore rejects this challenge to the award of prejudgment interest.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The judgment of the bankruptcy court is VACATED in its entirety and this matter is REMANDED to the bankruptcy court for further proceedings consistent with this opinion; and

2.    This appeal (ECF No. 15) is TERMINATED.

Dated this 19th day of March, 2015.

BY THE COURT:

_____

William J. Martínez
United States District Judge

24